IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 6, 2025

**KENNETH BROWN v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County
Nos. 11-02623, 11-07432   Lee V. Coffee, Judge**

_____

**No. W2024-01291-CCA-R3-ECN**

_____

In October 2012, a jury convicted Petitioner, Kenneth Brown, of one count of first degree premeditated murder, twelve counts of criminal attempt to commit first degree murder, twelve counts of aggravated assault, one count of employment of a firearm during a dangerous felony, and one count of reckless endangerment, for which he received an effective sentence of life imprisonment plus 308 years.  In August 2023, Petitioner filed pro se petitions for post-conviction DNA and fingerprint analysis and a petition for writ of error coram nobis.  The post-conviction court summarily dismissed the petitions.  On appeal, Petitioner asserts that the post-conviction court improperly dismissed the petition for post-conviction fingerprint analysis and the petition for writ of error coram nobis.  Following a thorough review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JILL BARTEE AYERS and STEVEN W. SWORD, JJ., joined.

Kenneth Brown, Whiteville, Tennessee, pro se.

Jonathan Skrmetti, Attorney General and Reporter; Garrett D. Ward, Senior Assistant Attorney General; and Steve Mulroy, District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual and Procedural Background**

On July 3, 2010, Dena Watkins and Nakia Greer "flagged down" Petitioner outside a house on Northmeade Avenue in Memphis to ask about purchasing marijuana. *State v.*

*Brown*, No. W2013-00329-CCA-R3-CD, 2014 WL 5092906, at *2 (Tenn. Crim. App. Oct. 9, 2014), *perm. app. denied* (Tenn. Feb. 13, 2015). Petitioner returned a few minutes later and conversed with Ms. Watkins for a few minutes before again leaving. *Id*. About twenty minutes later, Petitioner and two co-defendants returned and confronted Ms. Greer with an accusation that Ms. Watkins, who had left to go to the store, had stolen some marijuana from him. *Id*. at *1, 3. Ms. Watkins' brother-in-law, Felix Williams, gave Petitioner $5 and asked him to leave. *Id*. at *3.

Petitioner returned to his car and began to drive away, but as he was doing so, he nearly struck a man named Robrecus Braxton. *Id*. at *2. Mr. Braxton responded by throwing a beer can through the passenger window of Petitioner's car. *Id*. Petitioner then stopped his car, and he and his co-defendants engaged in a fist fight with Mr. Braxton and two of Mr. Braxton's friends. *Id*. After the fight broke up, Petitioner and his co-defendants were leaving when one of them said either, "We'll be back" or "All right, that's what up[,]" which Mr. Braxton understood to mean the men would return. *Id*. at *2-3.

Later, as Mr. Williams was walking his niece, Kimberly Jamerson, to her car parked at the Northmeade house, someone shot several bottle rockets at them. *Id*. at *3. Seconds later, gunfire started. *Id*. Witnesses at the Northmeade house testified to hearing upwards of fifty gunshots. *Id*. at *2, 4. Two people at the Northmeade house, Steven and Mark Chambers, returned fire with two 9mm handguns. *Id*. at *4. During the gunfire, one bullet struck Ms. Jamerson in the head and killed her. *Id*. at 7. Mr. Williams later identified Petitioner as one of the shooters. *Id*. at *1.

During the investigation into the shooting, law enforcement obtained several statements from Petitioner, in which Petitioner admitted to participating in the fist fight with Mr. Braxton and in the shootout. *Id*. at *7. Petitioner stated that, after the fist fight, he returned to his home but that his family was angry. *Id*. at *8. He further stated that he and his two co-defendants then drove to a house on Helmwood, jumped out of the car, and began firing guns. *Id*. Petitioner claimed that he fired a .45 caliber handgun into the air six to eight times. *Id*. Petitioner said that one co-defendant fired a shotgun twice and that the other co-defendant also fired a gun, but he could not provide a type fired or the number of shots. *Id*.

Law enforcement ultimately discovered sixty-eight shell casings outside the Helmwood home. *Id*. Of the sixty-eight, thirty-two were .30 carbine casings, eight were .45 casings, twenty-five were LC05 casings, and three were 20-gauge shotgun casings. *Id*. at *7. At the Northmeade location, law enforcement found five 7.62x39mm casings and nine 9mm casings. *Id*. Ballistic testing of a bullet fragment recovered from Ms. Jamerson's head revealed she had been struck with a .30-caliber bullet. *Id*. at *9. Additionally, this fragment matched a bullet fragment that was recovered from the Northmeade location,

meaning the two bullets were fired by the same firearm. *Id.* at *7-9. The State's ballistics expert opined that a .30-caliber bullet could be loaded in a 7.62x39mm casing but that this was "very rare[.]" *Id.* at *9. He testified that .30-caliber bullets were more typically fired in a .30 carbine cartridge. *Id.*

Petitioner was tried separately from his co-defendants in October 2012. *Id.* at *1. The jury convicted Petitioner of one count of first degree premeditated murder, twelve counts of criminal attempt to commit first degree murder, twelve counts of aggravated assault, one count of employment of a firearm during a dangerous felony, and one count of reckless endangerment in connection with the shooting. *Id.* The trial court merged the attempted murder and aggravated assault convictions and sentenced Petitioner to life imprisonment plus 308 years. *Id.* Petitioner filed a timely motion for new trial, which the trial court denied on December 18, 2012.[1]

On direct appeal, Petitioner argued that the evidence was insufficient to sustain his murder and attempted murder convictions and that the trial court erred in failing to suppress his confession. *Id.* In addressing the sufficiency of the evidence, this court summarized the evidence against Petitioner, as follows:

> Viewed in the light most favorable to the State, the evidence at trial showed that [Petitioner] and two others fired weapons at a large gathering of people on Northmeade, killing one and wounding one. [Petitioner] was on the losing end of a fist fight after he accused Dena Watkins of stealing $5 worth of marijuana from him. His car was damaged in the aftermath of the fight. Later, [Petitioner], David Richardson, and Devon Brown gathered firearms, and [Petitioner] drove them to the Helmwood location. The forensics revealed that four weapons were fired from that location, and the police collected thirty-two .30 carbine cartridge cases, eight .45 auto cartridge cases, twenty-five .223 Remington caliber cartridge cases, and three .20 gauge shot shell cases. The men disposed of the weapons after the shooting, and the weapons were never found. T[ennessee Bureau of Investigation] Special Agent Scott testified that the bullet that killed Kimberly Jamerson was consistent with a .30 carbine.
>
> [Petitioner] confessed his involvement in the shooting but claims on appeal that he "had no intent to kill." However, it is clear that either [Petitioner] or one of the men with him fired the shots that killed Ms.

---

[1] To assist in the resolution of this proceeding, we take judicial notice of the record from Petitioner's direct appeal and post-conviction appeal. *See* Tenn. R. App. P. 13(c); *State v. Lawson*, 291 S.W.3d 864, 869 (Tenn. 2009); *Delbridge v. State*, 742 S.W.2d 266, 267 (Tenn. 1987); *State ex rel. Wilkerson v. Bomar*, 376 S.W.2d 451, 453 (Tenn. 1964).

Jamerson and wounded Mr. Moore. Because it is unknown which of the men fired the murder weapon, it is appropriate to apply a criminal responsibility theory to determine [Petitioner's] guilt. *See State v. Dickson*, 413 S.W.3d 735, 744-48 (Tenn. 2013) (concluding that evidence of the shooter's premeditation was sufficient to support defendant's conviction for attempted premeditated murder when defendant solicited the aid of the shooter and when the shooting was a natural and probable consequence of the defendant's actions). In this case, the State sufficiently showed that [Petitioner] shared the intent required for premeditated murder with his accomplices and that he actively promoted the commission of the crime. [Petitioner] and his accomplices procured weapons before the crime, set up at a location where the victims would be unable to see them, and used deadly weapons on unsuspecting, unarmed victims. The killing of Ms. Jamerson and the wounding of Mr. Moore were the natural and probable consequences of firing upon a crowd of people. Thus, [Petitioner] was criminally responsible for Ms. Jamerson's murder and the attempted murders of Mr. Moore and the other named victims. We conclude that this evidence was sufficient for any rational jury to find [Petitioner] guilty beyond a reasonable doubt of first degree premeditated murder and attempted premeditated murder.

*Id*. at *12. This court ultimately affirmed the judgments of conviction, and the Tennessee Supreme Court denied Petitioner's application for permission to appeal. *Id*. at *1.

Petitioner subsequently filed a timely pro se petition for post-conviction relief. *Brown v. State*, No. W2017-01755-CCA-R3-PC, 2019 WL 931735, at *2 (Tenn. Crim. App. Feb. 22, 2019), *perm. app. denied* (Tenn. July 25, 2019). Following the appointment of counsel, an amended petition was filed, alleging ineffective assistance of trial and appellate counsel. After holding an evidentiary hearing, the post-conviction court denied relief. *Id*. at *3-5. On appeal, Petitioner argued that he was entitled to post-conviction relief because trial counsel provided ineffective assistance by failing to: present Agent James Davis at trial; present Beatrice Vaulx at trial; and request a jury instruction on proximate cause of death. *Id*. at *6. Upon review, this court affirmed the denial of post-conviction relief, and the Tennessee Supreme Court denied further review. *Id*. at *1.[2]

---

[2] Petitioner has also pursued relief from his convictions and sentence in federal court. On April 27, 2020, Petitioner, through counsel, filed a Writ of Habeas Corpus by a Person in State Custody under 28 U.S.C. § 2254, in the United States District Court for the Western District of Tennessee. Petitioner presented the following claims: (1) denial of right to compulsory process due to the trial court's failure to compel the production of Beatrice Vaulx or, alternatively, due to the ineffective assistance of trial counsel in failing to subpoena Vaulx or demand a material witness warrant; (2) admission of involuntary confession; and (3) omission of jury instruction on proximate cause of death, including that counsel was ineffective in failing to request such an instruction. *Brown v. Fitz*, No. 2:20-cv-02315-SHL-atc, 2023 WL 6279523, at

On August 4, 2023, Petitioner filed pro se an omnibus pleading titled, "Petition for DNA Post Conviction Relief[;] Petition for Post Conviction Fingerprint Analysis[;] Petition for Writ of Error Coram Nobis." Regarding his post-conviction petitions for DNA and fingerprint analysis, Petitioner requested that the trial court order the testing of touch DNA profiles and fingerprints "found on the 7.62x39mm shell casings that the police recovered from the residence [on] . . . North[m]eade . . . where the victim Kimberly Jamerson was fatally shot." Petitioner asserted that the 7.62x39mm shell casings contained fingerprints and DNA profiles of "the rivaling shooters at Northmeade[,]" Felix Williams, Mark Chambers, and Steve Chambers. He argued that the evidence would "clearly and convincingly" disprove the State's prosecutorial theory and that the information "would have resulted in a jury finding that Petitioner was actually innocent of the premeditated murder of Kimberly Jamerson."

In his petition for writ of error coram nobis, Petitioner alleged that newly discovered evidence showed that the State "knowingly suppressed pertinent impeachment evidence regarding non-prosecution agreements with Felix Williams, Nakia Greer, and other State witnesses." He asserted:

> [T]here is evidence of cars that were reported as being stolen, were present at the scene of the shooting; and were actually in the possession of people who were firing and discharging weapons from the residence . . . where the victim was killed, and that the Shelby County [D]istrict Attorney's office entered into a de facto non-prosecution agreement with the state witnesses, like Felix Williams, who owned these vehicles.
>
> . . . .
>
> There existed a non-prosecution agreement between the State and various witnesses who were present at the residence [on] . . . North[m]eade that was purposefully suppressed and withheld from Petitioner . . . that dealt with these witnesses['] immunity for: (a) solicitation of a controlled substance; (b) possession of stolen vehicle; and (c) being a convicted felon in possession of a firearm[.]

---

*3 (W.D. Tenn. Sept. 26, 2023). The district court denied relief, and the United States Court of Appeals for the Sixth Circuit denied a certificate of appealability. *Brown v. Wardlow*, No. 23-5966, 2024 WL 4729429, at *1 (6th Cir. May 20, 2024). Thereafter, Petitioner filed a petition for writ of certiorari, which was denied by the Supreme Court of the United States. *Brown v. Adams*, 145 S.Ct. 1336 (Mar. 10, 2025) (Mem).

Petitioner asserted that he was "only able to obtain copies of this illicit conduct suppressed by the State, within the last 12 (twelve) months" and that he was entitled to due process tolling of the one-year statute of limitations.

On November 14, 2023, Petitioner filed an amended petition for writ of error coram nobis and a petition to reopen post-conviction proceedings, alleging that there was new scientific evidence establishing that he was "actually innocent of the offense or offenses for which [he] was convicted." Specifically, Petitioner asserted that he had newly discovered evidence that TBI Special Agent Scott's ballistics testimony "lacked a sufficient indicia of reliability because it was not subject to a blind peer review" as required by TBI policy. Petitioner alleged that Special Agent Scott "conducted a forensic analysis on 7.62x.39[mm] shell casings, but did not have his findings verified by a 2nd examiner, which undermined the validity of his findings in the final report on his examination of the firearms, bullets, and shell casings[.]" In support of his claim, Petitioner attached a letter to the petition from former Shelby County District Attorney Amy Weirich dated July 28, 2021, which discussed possible financial misconduct by a different TBI agent than Special Agent Scott.

On July 29, 2024, the post-conviction court summarily dismissed all motions in a lengthy written order. The court found that any DNA or fingerprints recovered from the shell casings "would not have been of any value[,]" meaning that Petitioner had not shown a reasonable probability that an exculpatory result would have resulted in his not being prosecuted, not being convicted, or receiving a more favorable verdict or sentence. The court also found that Petitioner failed to establish that, after fourteen years, any meaningful testing could be done to determine fingerprint results in the case. Regarding the petition for writ of error coram nobis, the court determined that the evidence was not newly discovered and that it had been in Petitioner's possession for more than fourteen years.

This timely appeal follows.

## II. Analysis

### A. Post-Conviction Fingerprint Analysis

On appeal, Petitioner contends that the post-conviction court abused its discretion by summarily dismissing his petition for post-conviction fingerprint analysis.[3] Petitioner asserts that the post-conviction court based its decision on his "prior 2014 appeal determination rather than following the appropriate 'Reasonable Probability Threshold

---

[3] In his brief, Petitioner does not challenge, and makes no argument regarding, the dismissal of his petition for post-conviction DNA analysis.

Inquiry' requirement" found in Tennessee Code Annotated section 40-30-404. He contends that,

> [v]iewed in light of the appropriate Reasonable Probability Threshold, if the results from the fingerprint analysis upon the 7.62x39[mm] caliber casings yield favorable evidence such as fingerprints belonging to [Mr.] Williams or belonging to any of the [State's] witnesses from the party on the night of the shooting death of [Ms.] Jamerson, [Petitioner] likely would have been acquitted.

The Post-Conviction Fingerprint Analysis Act of 2021 ("the Fingerprint Analysis Act") provides that a person convicted of and sentenced for first degree murder, among other offenses, may file a petition

> requesting the performance of fingerprint analysis of any evidence that is in the possession or control of the prosecution, law enforcement, laboratory, or court, and that is related to the investigation or prosecution that resulted in a judgment of conviction and that may contain fingerprint evidence.

Tenn. Code Ann. § 40-30-403(a), (b)(3)(A).

The Fingerprint Analysis Act provides that the court shall order fingerprint analysis if the court finds that:

> (1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through fingerprint analysis;

> (2) The evidence is still in existence and in such a condition that fingerprint analysis may be conducted;

> (3) The evidence was never previously subjected to fingerprint analysis, was not subjected to the analysis that is being requested which could resolve an issue not resolved by previous analysis, or was previously subjected to analysis and the person making the motion under this part requests analysis that uses a new method or technology that is substantially more probative than the prior analysis; and

> (4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

- 7 -

Tenn. Code Ann. § 40-30-404. Additionally, the court may order fingerprint analysis if the court finds that:

(1) A reasonable probability exists that analysis of the evidence will produce fingerprint results that would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction;

(2) The evidence is still in existence and in such a condition that fingerprint analysis may be conducted;

(3) The evidence was not previously subjected to fingerprint analysis, was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis, or was previously subjected to analysis and the person making the motion under this part requests analysis that uses a new method or technology that is substantially more probative than the prior analysis; and

(4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

Tenn. Code Ann. § 40-30-405.

The Fingerprint Analysis Act, other than substituting the word fingerprint for DNA, is identical to the test in the Post-Conviction DNA Analysis Act, which provides for mandatory testing in certain cases and discretionary testing in others. *See* Tenn. Code Ann. §§ 40-30-304, -305; *Smith v. State*, No. M2021-01339-CCA-R3-PD, 2022 WL 854438, at *13 (Tenn. Crim. App. Mar. 23, 2022), *perm. app. denied* (Tenn. Apr. 6, 2022). Because of the similarity in the statutory language, Tennessee courts may look to jurisprudence governing the Post-Conviction DNA Analysis Act for guidance in dealing with cases involving the Post-Conviction Fingerprint Analysis Act. *See, e.g.*, *Smith*, 2022 WL 854438, at *13; *Barnes v. State*, No. M2022-00367-CCA-R3-PC, 2022 WL 4592092, at *6 (Tenn. Crim. App. Sep. 30, 2022), *no perm. app. filed*.

In *Powers v. State*, our supreme court explained that "[u]nder either the mandatory or discretionary provision, all four elements must be met before DNA analysis will be ordered by the court." 343 S.W.3d 36, 48 (Tenn. 2011). A reasonable probability is a probability sufficient to undermine confidence in the conviction or prosecution. *Id.* at 55. In conducting its analysis of a petitioner's claim, a post-conviction court must presume that the DNA analysis would produce favorable results to the petitioner. *Id.* The post-

conviction court is afforded considerable discretion in its decision whether to grant a petitioner relief under the Post-Conviction DNA Analysis Act, and its judgment will not be reversed unless unsupported by substantial evidence.  *See Jones v. State*, No. W2014-02306-CCA-R3-PC, 2015 WL 3882813, at *3 (Tenn. Crim. App. June 24, 2015), *perm. app. denied* (Tenn. Sept. 21, 2015); *State v. Downs*, No. W2019-01485-CCA-R3-CD, 2020 WL 6779971, at *4 (Tenn. Crim. App. Nov. 17, 2020), *no perm. app filed*.

A post-conviction court is not required to hold an evidentiary hearing in order to decide whether testing should be granted.  *Powers*, 343 S.W.3d at 56.  Instead, it may rely on stipulations offered by the parties and recitation of facts in prior appellate opinions detailing the trial evidence.  *Id*. at 55-56.  The court, however, must "look at the effect the exculpatory DNA evidence would have had on the evidence at the time of trial or at the time the decision to prosecute was made, not on the evidence as construed by an appellate court in the light most favorable to the State."  *Id*. at 56-57 (footnote omitted).  If it is apparent that not all prerequisites can be met, "summary dismissal is appropriate."  *Downs*, 2020 WL 6779971, at *5.  The petition itself must lay out a prima facie case for relief or be subject to summary dismissal.  *Id*.  Applying this jurisprudence to cases involving the Fingerprint Analysis Act, a court dealing with a petition for post-conviction fingerprint analysis need not hold an evidentiary hearing to determine whether testing should be granted; testing may only be granted if all four elements of the test are satisfied; courts should presume the testing will be exculpatory; and the court's determination is reviewed for abuse of discretion.  *Barnes*, 2022 WL 4592092, at *6.

In this case, the post-conviction court did not abuse its discretion in dismissing the petition for post-conviction fingerprint analysis.  First, as found by the post-conviction court, Petitioner did not demonstrate that the relevant shell casings still exist in a condition that would allow for meaningful testing.  *See* Tenn. Code Ann. §§ 40-30-404(2), -405(2).  Petitioner did not address the continued existence of the shell casings or their condition in either his petition for post-conviction fingerprint analysis or in his brief.

Moreover, Petitioner asserted that, if the 7.62x39mm shell casings found at the Northmeade location were analyzed for fingerprints, they would be shown to contain the fingerprints of "the rivaling shooters at Northmeade"—Felix Williams, Mark Chambers, and Steve Chambers.  However, even if fingerprints belonging to one of these individuals were found on the 7.62x39mm shell casings, Special Agent Scott testified at Petitioner's trial that the bullet fragments removed from Ms. Jamerson's head matched a .30 carbine caliber bullet and that those fragments were not consistent with the 7.62x39mm cartridge cases.  *See Brown*, 2014 WL 5092906, at *9.  Thus, Petitioner has not shown that exculpatory results from fingerprint analysis on the 7.62x39mm shell casings would have created a reasonable probability of a more favorable verdict or sentence or a reasonable probability of Petitioner not being prosecuted or convicted.  *See* Tenn. Code Ann. §§ 40-

30-404(1), -405(1).  Under these circumstances, the post-conviction court's summary dismissal was appropriate.

## B. Writ of Error Coram Nobis

Petitioner asserts that the post-conviction court abused its discretion by summarily dismissing his petition for writ of error coram nobis without an evidentiary hearing. Petitioner claims that, at trial, the court erred by admitting into evidence the "unqualified expert opinion" of ballistics examiner Special Agent Scott.  As "newly discovered evidence" in support of this claim, Petitioner cites the letter from former Shelby County District Attorney Amy Weirich dated July 28, 2021, that "revealed . . . the Tennessee Bureau of Investigation maintains a verification procedure and policy for laboratory analysts when submitting reports on ballistic microscopic comparisons and tool marking." Petitioner asserts that Special Agent Scott's firearms report was "defective" because it contained the signature of only Special Agent Scott; he argues that this shows Special Agent Scott did not have a second examiner review his work, in violation of a TBI policy.

A writ of error coram nobis in criminal cases is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999).  "A writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial . . . if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial." Tenn. Code Ann. § 40-26-105(b).  The writ comes "with stringent statutory requirements[,]" and "the petition must be pled with specificity." *Clardy v. State*, 691 S.W.3d 390, 400 (Tenn. 2024).  A trial court may grant the writ only when the coram nobis petition is in writing and describes "with particularity the nature and substance of the newly discovered evidence" and "demonstrates that it qualifies as newly discovered evidence." *Nunley v. State*, 552 S.W.3d 800, 816 (Tenn. 2018) (citing *Payne v. State*, 493 S.W. 3d 478, 484-85 (Tenn. 2016)).  Error coram nobis relief is only available "[u]pon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time." Tenn. Code Ann. § 40-26-105(b).  A trial court may dismiss a petition for a writ of error coram nobis "on the face of the petition, without discovery or an evidentiary hearing, and even prior to notification to the opposing party." *Nunley*, 552 S.W.3d at 825.  The decision to grant or deny coram nobis relief rests within the sound discretion of the trial court.  *State v. Vasques*, 221 S.W.3d 514, 527-28 (Tenn. 2007).

Petitions for writ of error coram nobis are subject to a one-year statute of limitations. Tenn. Code Ann. § 27-7-103.  "The statute of limitations is computed from the date the judgment of the trial court becomes final, either thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed, post-trial motion." *Harris v. State*, 301 S.W.3d 141, 144 (Tenn. 2010).  "Timeliness under the

statute of limitations . . . is not an affirmative defense; rather, it is one of the essential elements of a coram nobis claim." *Clardy*, 691 S.W.3d at 401. If a coram nobis petition "does not show on its face that it is filed within the one-year statute of limitations, the petition must set forth with particularity facts demonstrating that the prisoner is entitled to equitable tolling of the statute of limitations." *Nunley*, 552 S.W.3d at 829. "[T]he coram nobis statute of limitations may be tolled only if the petitioner produces newly discovered evidence that would, if true, establish clearly and convincingly that the petitioner is actually innocent of the underlying crime of which he was convicted." *Clardy*, 691 S.W.3d at 407.

In this case, the limitations period normally would have begun to run on January 17, 2013, thirty days after the trial court denied Petitioner's motion for new trial. Therefore, the statute of limitations would have expired on January 17, 2014, more than nine years before Petitioner filed his petition for writ of error coram nobis. The petition was clearly untimely. Moreover, the alleged newly discovered evidence set out in the petition, even if true, does not clearly and convincingly establish that Petitioner is actually innocent of first degree murder. Thus, summary dismissal was appropriate.[4]

### III. Conclusion

Based upon the foregoing, we affirm the judgment of the post-conviction court.


s/*Robert L. Holloway, Jr.*
ROBERT L. HOLLOWAY, JR., JUDGE

---

[4] As a final matter, Petitioner raises an issue in his brief regarding a motion he filed in the post-conviction court requesting that the court "take judicial notice of the fact that [Petitioner's] original judgment sheets never bore the statutorily mandated 'File-Stamp' by a duly empowered court clerk[, thereby] nulling and voiding all subsequent appellate proceedings held in result of the error." Petitioner acknowledges, however, that the post-conviction court never ruled on the motion and that this court lacks jurisdiction to address the issue on appeal. *See Holland v. State*, 610 S.W.3d 450, 459 (Tenn. 2020) (holding that, in post-conviction cases, this court is without authority to review issues not addressed by the post-conviction court).

- 11 -